PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 10-4573

———————

UNITED STATES OF AMERICA

v.

JAMES TURNER,

Appellant

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 08-cr-00515)
District Judge:  Honorable Legrome D. Davis

———————

Submitted Under Third Circuit LAR 34.1(a)
January 26, 2012

Before: AMBRO, CHAGARES
and HARDIMAN, *Circuit Judges*.

(Opinion Filed: April 19, 2012)

Jessica Natali
Bea L. Witzleben
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
	*Attorneys for Plaintiff-Appellee*

Walter S. Batty, Jr.
101 Columbia Avenue
Swarthmore, PA 19081

Sara M. Webster
Mellon, Webster & Mellon
87 North Broad Street
Doylestown, PA 18901-0000
	*Attorneys for Defendant-Appellant*

—————————

OPINION OF THE COURT

—————————

HARDIMAN, *Circuit Judge*.

James Turner appeals his judgment of conviction following a jury trial. Turner's court-appointed lawyers raise two issues on appeal. In addition, they have noted nine other issues they deem frivolous. Further complicating matters, Turner has filed several documents pro se. The apparent discord between Turner and his counsel invites us to explain the proper

role of appellate counsel who represent intransigent clients and to clarify the meaning of our Local Appellate Rule 31.3.

I

A

In late 2005 or early 2006, Special Agent Patrick Edwards of the Bureau of Alcohol, Tobacco, and Firearms (ATF) began patronizing Kazoo's Barber Shop School of Hard Knocks in downtown Philadelphia. During his periodic visits to Kazoo's, Agent Edwards noticed that his barber—whose real name was Victor Lawson, but who called himself "Mikail"—always carried guns. Edwards also became aware of illegal activities at Kazoo's, including the sale of stolen and counterfeit items. This prompted Edwards to investigate, and he learned that Lawson had been convicted of felonies in Pennsylvania and New Jersey. Consequently, Edwards decided to try to purchase firearms at Kazoo's.

Edwards made three purchases from Lawson. On a fourth occasion, Lawson displayed a Kel-Tec rifle that he boasted could be used for "urban combat." Edwards expressed interest in the Kel-Tec rifle and said that he would return with money for the purchase. He then prepared probable cause affidavits and obtained a warrant to search Lawson's residence and Kazoo's. When ATF agents executed the warrants and arrested Lawson, they recovered the rifle. Edwards traced the rifle to Lou's Loans, a federal firearms licensee in Upper Darby, Pennsylvania. The original buyer was Lionel Coates.

Lawson could not have obtained the rifle legally because he was a felon, so Edwards asked him how he got it. Lawson

responded that he bought the rifle from "Jabriel" in Philadelphia. Edwards showed Lawson a photo array, but Lawson could not identify the man who sold him the gun. Turner's photo was not part of this array.

Edwards then interviewed Coates, the original purchaser of the rifle, who said that he bought the gun for "Jabriel." According to Coates, "Jabriel" really was named "James" and lived near "25th and Ritner Street." Edwards entered this information into a database and retrieved Turner's photo. When presented with an array that included Turner's photo, Coates and Lawson identified him as "Jabriel."

According to Coates, "Jabriel" approached him to buy a gun. "Jabriel" drove Coates to Lou's Loans and pointed to the Kel-Tec rifle he wanted. A week later, "Jabriel" again drove Coates to Lou's and gave him money to purchase the rifle. Both men entered the store, and Coates supplied his identification and paperwork, including a written statement that he was the "actual buyer" of the firearm. When the purchase was complete, the men left the store and placed the gun in "Jabriel's" car. "Jabriel" paid Coates $250.

Based on this evidence, Turner was indicted for three weapons offenses. Count One charged him with conspiring to make false statements to a firearms dealer, *see* 18 U.S.C. §§ 371, 924(a)(1)(A), and alleged that Coates acted as Turner's "straw purchaser" at Lou's Loans. Count Two charged Turner with knowingly aiding and abetting Coates in making false statements to a firearms dealer. *See* 18 U.S.C. § 924(a)(1)(A), (2). Count Three charged Turner with knowingly possessing a firearm after being convicted of a felony. *See* 18 U.S.C. §§ 922(g)(1), 924(e).

4

B

Lawson and Coates entered into plea agreements with the Government and testified against Turner at trial. Turner's counsel attacked their credibility in his opening statement, suggesting that Lawson and Coates "spill[ed] [their] guts . . . to get a deal." Counsel also referred to the cooperating witnesses as "rotten timbers to support the roof" of the Government's case and called Lawson a "bad apple" and a "rat." He concluded his opening statement by asserting that the Government had nothing but "the testimony of two liars."

During cross-examination, Turner's counsel accused Agent Edwards of helping to "orchestrate" the Government's case and insinuated that Edwards impermissibly helped Lawson identify Turner. Counsel also implied that Lawson had lied to curry favor with the Government, asking Edwards: "when Victor Lawson started to spill the beans, you took notes with respect to all of the individuals that he targeted, correct?," and "as far as you know how this process works, when he ultimately gets sentenced, who knows how many years from now, the judge who's going to be sentencing him is going to hear how he testified [in other cases] whether the testimony was truthful or not[?]."

On redirect examination, Edwards testified that Lawson had cooperated with the Government in other cases against twelve or thirteen people. According to Edwards, Lawson provided information regarding home invasions, robberies, straw purchasers, narcotics traffickers, and counterfeiting. When the Government asked Edwards, "[w]hat happened with the other cases?," Turner objected. The District Court overruled the objection, and Edwards answered, "[a]ll of the defendants

5

that have been charged to date have either pled guilty or gone to trial and were found guilty." Turner renewed his objection, but the District Court denied it because Edwards's statement was "an objective fact."

The jury also heard Lawson testify that he initially did not tell Edwards that "Jabriel" was Turner because Lawson had been calling Turner "Jabriel" for so long that he had forgotten Turner's real name. On cross-examination, Turner's counsel accused Lawson of "forget[ting] things that are convenient" and "diming out" people to fulfill a "contract" with the Government.

During redirect examination, the Government argued that Turner had "opened the door" about how well Lawson knew Turner and sought permission "to ask [Lawson] how he kn[ew] what [Turner's] real name was as opposed to his Muslim name." The Court allowed the Government to do so but instructed the Government to use "pointed questions" and to avoid using the word "Muslim." When questioning resumed, Lawson stated that he met Turner through a religious organization in the 1980's, when he knew him both by his "birth name" and as "Jimmy X Turner." Lawson used this name in a "dossier," which was a "profile on each member of the [religious] organization[,] their name, their home address, their educational background, their criminal records, and so on and so forth." Finally, Lawson testified that by the time Edwards interviewed him, he had forgotten Turner's real name and only referred to him by the "name that's given to [him] in the organization" because "[n]obody uses their Christian name on the streets." Lawson confirmed that his own "religious name" was "Mikail."

The jury found Turner guilty on all three counts. He was subject to a mandatory minimum sentence of 180 months'

6

imprisonment pursuant to the Armed Career Criminal Act, 18 U.S.C. § 924(e), and his advisory imprisonment range under the United States Sentencing Guidelines was 210 to 262 months. The District Court varied downward, imposing a sentence of 190 months' imprisonment. Turner filed a timely notice of appeal. The District Court then granted trial counsel leave to withdraw and appointed new counsel for Turner.[1]

## C

Once on appeal, this case took several unusual turns. First, Turner's counsel filed what might be called a "quasi-*Anders* brief," which raised a combination of colorable and frivolous arguments. As for the colorable arguments, Turner's counsel challenged the District Court's failure to give a jury instruction regarding testimony about the guilty pleas and verdicts resulting from Lawson's cooperation with the Government. Counsel also challenged the District Court's failure to strike Lawson's references to "Jimmy X Turner" and the "criminal record[s]" in his "dossier." In addition to these two arguments, Turner's counsel raised nine issues "in the style of an *Anders* brief," explaining why they considered those issues frivolous.

Taking his cue from counsel's brief, Turner filed a pro se document requesting that his counsel withdraw and advancing entirely new arguments on the merits. Because Turner styled this document as a "supplement to be attached to the brief filed [by counsel]," we construed it as a motion for leave to file a

---

[1] The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. Our jurisdiction lies under 28 U.S.C. § 1291.

supplemental brief. Two weeks later, Turner's counsel filed a separate "Motion for Leave for the Appellant to File a Pro Se Supplemental Brief." In doing so, counsel acknowledged that Third Circuit Local Appellate Rule 31.3 prohibits represented parties from filing pro se briefs, but they noted that the Rule also allows counsel "in the unusual case [to] file a motion to file a supplemental brief, if appropriate." 3d Cir. L.A.R. 31.3. Counsel conceded that this case was not governed by *Anders* because they had not sought to withdraw from their representation of Turner. Nevertheless, counsel urged the Court to accept a supplemental brief from Turner because their "quasi-*Anders*" brief rendered this an "unusual case" under Local Appellate Rule 31.3.

A motions panel of this Court entered an order referring both Turner's and his counsel's motions to the merits panel. The Government filed a motion for reconsideration of that order, arguing that it contravened Local Appellate Rule 31.3 because it required the Government to respond to the litany of issues raised in both counsel's "quasi-*Anders* brief" and Turner's pro se motion. According to the Government, Turner was improperly seeking "hybrid representation" and "should [have been] compelled to determine . . . whether he [was] represented by counsel or wishe[d] to proceed pro se."

Because we had not yet ruled on whether Turner could file a supplemental brief pro se, Turner and his counsel responded to the Government's motion independently. First, Turner filed a motion purporting to "counterattack" the Government's motion, as well as requesting "hybrid representation by both counsel and defendant" because there were "issues of merit that [they stood] divided on." Next, counsel filed their own response to the Government's motion,

8

reiterating that this qualified as an "unusual case" under Local Appellate Rule 31.3. Counsel added that they had filed a "quasi-*Anders*" brief "to satisfy [their] dual obligations to the defendant and to this Court . . . to make any arguments they could in good faith on the defendant's behalf [while addressing] arguments that the client insisted be made, despite [their] advice."

The motions panel denied the Government's motion for reconsideration. Consequently, the Government filed a merits brief that addressed the two non-frivolous issues in counsel's "quasi-*Anders*" brief but insisted that pro se briefs by counseled parties violate our local rules. Turner's counsel filed a reply brief, contending that Local Appellate Rule 31.3 was ambiguous and could be read to permit counsel "in the unusual case [to] file a motion to file a supplemental brief [authored by the pro se defendant]." The case was calendared, and oral argument was scheduled.

The case took yet another twist, however, when we granted Turner's and counsel's long-pending initial motions, which had requested leave for Turner to file a pro se supplemental brief. Turner seized on this opportunity to file yet another brief, which he conceded did not "quote[] any case law, states [sic], or rules" but which nevertheless raised four additional issues. Justifiably perplexed, the Government responded to Turner's third and final pro se filing, beginning with the understatement that "[t]his appeal has followed a most unusual course." The Government also expressed confusion because it believed that Turner already had submitted a supplemental pro se brief as part of his first motion to this Court. The Government therefore was "unclear whether the opportunity to file a pro se supplemental brief [in the Court's

9

latest order] referred to a new brief, or a reply brief to the government's brief." Finally, the Government once again argued that the Court should not consider Turner's pro se arguments while he was represented by counsel, but "for the benefit of the Court" the Government responded to "the latest four in the apparently endless[] series of pro se issues presented by Turner."

## II

Turner concedes that we review the two colorable issues raised by his appellate counsel for plain error because they were not raised at trial. *See* Fed. R. Crim. P. 52(b). "To find plain error, we must conclude that (1) there was error; (2) the error was clear or obvious; (3) the error affected the defendant's substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the legal proceeding." *United States v. Tyson*, 653 F.3d 192, 211 (3d Cir. 2011) (citing *United States v. Lee*, 612 F.3d 170, 178 (3d Cir. 2010)). "If the defendant satisfies this showing, we may, but are not required to, order correction." *Id.* (citing *United States v. Olano*, 507 U.S. 725, 735–36 (1993)).

## III

Having described the convoluted procedural history of this case and the applicable standard of review, we turn to the merits of the non-frivolous issues raised by counsel in Turner's opening brief. Through counsel, Turner argues that the District Court erred by failing to give a limiting instruction regarding Lawson's cooperation with the Government. Turner concedes, however, that he has "not found any case law supporting [his] position" and that his argument "is not based on any direct

10

precedent." The absence of controlling precedent forecloses Turner's plain error argument on this issue. And while he contends that *United States v. Universal Rehabilitation Services (PA), Inc.*, 205 F.3d 657 (3d Cir. 2000) (en banc), is "analogous" to his case, he also candidly admits that there are "important differences between the two types of situations." We agree that *Universal Rehabilitation Services* is distinguishable and therefore find no "clear or obvious" error in the District Court's failure to give a limiting instruction.

Turner also argues that the District Court plainly erred by allowing the Government to elicit testimony regarding "Jimmy X Turner" and Lawson's "dossier," which purportedly contained Turner's "criminal records." Turner claims the reference to "Jimmy X Turner" had no probative value but "might be understood by at least some jurors as a reference to a Muslim associated with followers of the late 'Malcom X,' who some might think of as an anti-establishment radical." He also contends that Lawson's "dossier" reference suggested Turner was in "a religious organization where it was standard to have a criminal record."

We find no error, let alone plain error, in the District Court's admission of this evidence. Federal Rule of Evidence 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of . . . unfair prejudice." The risk of prejudice from this evidence was slight. The mere addition of "X" to Turner's name was unlikely to stoke the jury's passions. And although Lawson testified that he kept "dossiers" with information on "each member of the organization[,] their name, their home address, their educational background, their criminal records, and so on," he did not testify that Turner had a criminal record. Therefore, we reject Turner's

11

second argument.

IV

In addition to the colorable issues we have discussed, Turner's counsel have proffered nine arguments "in the style of an *Anders* brief," presenting issues that "the defendant directed counsel to raise" but explaining why they are frivolous.[2] Despite counsel's creative attempt to satisfy their client, Turner himself has filed two documents that raise a host of separate issues. As a result of this rift in the attorney-client relationship, Turner urges us to grant "hybrid representation . . . because there are issues . . . which [they] stand divided on." As we shall explain, this is not the proper procedure to follow when counsel and their clients disagree on which arguments to present to this Court.

A

We turn now to counsel's "quasi-*Anders*" brief. Although we have no doubt that it was well-intentioned and counsel were no doubt perplexed as to what to do, the brief was improper.

As an initial matter, Turner's counsel rightly note that they had no constitutional obligation to present frivolous issues in their brief. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("Neither *Anders* nor any other decision of this Court suggests . . . that the indigent defendant has a constitutional right to compel appointed counsel to press [even] *nonfrivolous* points

---

[2] Because we agree with counsel that these issues are frivolous, we do not address them here.

requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." (emphasis added)). Nevertheless, counsel contend that "the ethical rules applicable here, while they do not create an obligation to present any or all arguments which the defendant insists be raised, did provide a backdrop against which counsel made their strategic decisions." Counsel cite the Pennsylvania Rules of Professional Conduct, which require a lawyer to "reasonably consult with the client about the means by which the client's objectives are to be accomplished." Pa. R. Prof'l Conduct 1.4.

But the Pennsylvania Rules of Professional Conduct do "not prescribe how . . . disagreements are to be resolved." *Id.* at 1.2 cmt. 2. Indeed, other portions of the Rules suggest that counsel's approach was unwarranted. For example, they provide "the client may resolve the disagreement by discharging the lawyer."[3] *Id.* The Rules do not require anything like a "quasi-*Anders* brief." *Id.* To the contrary, they state that a "lawyer is not bound . . . to press for every advantage that might be realized for a client. For example, a lawyer may have authority to exercise professional discretion in determining the means by which a matter should be pursued." *Id.* at 1.3 cmt. 1. Moreover, the lawyer "shall not . . . assert or controvert an issue . . . unless there is a basis in law and fact for doing so that is not frivolous." *Id.* at 3.1. This basic rule accords with the Supreme Court's admonition that "[a]n attorney, whether appointed or paid, is . . . under an ethical obligation to refuse to prosecute a frivolous appeal." *McCoy v. Court of Appeals of Wis., Dist. 1*,

---

[3] We caution that a motion to discharge appellate counsel *after* counsel has filed a brief is likely to be denied. *See Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 163 (2000) (no right to self-representation on appeal).

13

486 U.S. 429, 436 (1988).  Stated simply, counsel need not, and should not, present frivolous arguments merely because a client instructs them to do so.[4]

Here, counsel's "quasi-*Anders*" brief runs afoul of the guidance provided by the Supreme Court in *McCoy*:

> It is essential to keep in mind that the so-called "*Anders* brief" is not expected to serve as a substitute for an advocate's brief on the merits, for it would be a strange advocate's brief that would contain a preface advising the court that the author of the brief is convinced that his or her arguments are frivolous and wholly without merit. Rather, the function of the brief is to enable the court to decide whether the appeal is so frivolous that the defendant has no federal right to have counsel present his or her case to the court.

*Id.* at 439 n.13.  *Anders* briefs ensure that constitutional rights are protected; they are not an opportunity to brief issues that would otherwise be unacceptable.  *Id.* at 444.  By filing an *Anders* brief without seeking to withdraw, counsel have presented issues to the Court that need not have been raised.  *Id.* at 436.

Attorneys "need not, and should not, raise every . . . claim but rather may select among them in order to maximize

---

[4] It is important to remember that the Supreme Court has held that an indigent appellant has no right to counsel of choice.  *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006).

14

the likelihood of success on appeal." *Showers v. Beard*, 635 F.3d 625, 634 (3d Cir. 2011) (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)).

> Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. . . . A brief that raises every colorable issue runs the risk of burying good arguments—those that . . . "go for the jugular"—in a verbal mound made up of strong and weak contentions.

*Jones*, 463 U.S. at 751–53. "Indeed, an appellate lawyer's exercise of professional judgment in omitting weaker claims is obviously of benefit to the client: the more claims an appellate brief contains, the more difficult for an appellate judge to avoid suspecting that there is no merit to any of them." *Johnson v. Tennis*, 549 F.3d 296, 302 (3d Cir. 2008) (citation and internal quotation marks omitted); *see also* Ruggero J. Aldisert, *The Appellate Bar: Professional Competence and Professional Responsibility—A View from the Jaundiced Eye of One Appellate Judge*, 11 Cap. U. L. Rev. 445, 458 (1982) ("Appellate advocacy is measured by effectiveness, not loquaciousness."). "[T]o second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies *Anders*." *Jones*, 463 U.S. at 754.

15

B

In addition to vetting frivolous issues in their "quasi-*Anders* brief," counsel invite us to consider Turner's pro se filings, which also present frivolous issues, because this is an "unusual case." We reject that invitation because our local rules preclude us from considering Turner's pro se arguments while he is represented by counsel. Accordingly, the order filed December 1, 2011 is hereby vacated.

Pro se litigants have no right to "hybrid representation" because "[a] defendant does not have a constitutional right to choreograph special appearances by counsel." *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984). "Once a pro se defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously . . . request[s] that . . . counsel be silenced." *Id.*

Even absent our longstanding prohibition on "hybrid representation," we still could not consider Turner's pro se filings because we are bound by our local rules, which state:

> Except in cases in which counsel has filed a motion under L.A.R. 109.2 to withdraw under *Anders v. California*, 386 U.S. 738 (1967), parties represented by counsel may not file a brief pro se. If a party sends a pro se brief to the court, the clerk will forward the brief to the party's attorney of record, with notice to the pro se party. Counsel may choose to include the arguments in his or her brief or may in the unusual case file a motion to

16

file a supplemental brief, if appropriate.

3d Cir. L.A.R. 31.3.  Consistent with this rule, we have stated repeatedly in not precedential opinions that we consider pro se briefs only in situations governed by *Anders.  See, e.g.*, *United States v. McCoy*, 272 F. App'x 212, 215 (3d Cir. 2008); *United States v. Reyes*, 271 F. App'x 217, 218 (3d Cir. 2008); *United States v. Awala*, 260 F. App'x 469, 471–72 (3d Cir. 2008); *United States v. Lott*, 240 F. App'x 992, 995 (3d Cir. 2007). Although in the past we considered counseled parties' pro se filings in "unusual circumstances," *see United States v. Salemo*, 61 F.3d 214, 218 n.2 (3d Cir. 1995); *United States v. Essig*, 10 F.3d 968, 969 (3d Cir. 1994), Local Appellate Rule 31.3 should have abrogated that practice when it became effective in 2002.

Counsel for Turner argue that Local Appellate Rule 31.3 is ambiguous.  In their view, "[c]ounsel may choose to include the arguments [of the pro se defendant] in his or her brief or may in the unusual case file a motion to file a supplemental brief [authored by the pro se defendant], if appropriate."  Counsel correctly imply that Rule 31.3 does not specify *who*, in the "unusual case," may be permitted to file a supplemental brief. The rule can be read, as counsel suggests, to permit the filing of pro se briefs by counseled defendants in "unusual" and "appropriate" cases.  But the rule also can be read, as the Government suggests, to require *all* supplemental briefs to be filed by counsel.

We find the Government's interpretation to be the more natural reading of Rule 31.3.  The Rule states that "*[c]ounsel . . . may . . . file a motion to file a supplemental brief*."  3d Cir. L.A.R.  31.3 (emphasis added).  There is no mention of *represented parties* in this sentence.  The beginning of Rule

31.3, which does mention pro se filings, states that they will be forwarded to counsel rather than submitted to the Court. *Id.* Moreover, allowing represented parties to file pro se supplemental briefs would contradict the first sentence of Rule 31.3, which states: "[e]xcept in [*Anders* cases], parties represented by counsel may not file a brief pro se." *Id.*

By requiring that briefs be filed only by counsel, we ensure that counsel and client speak with one voice. When a client seeks to raise additional issues, counsel must evaluate them and present only the meritorious ones, rather than simply seeking leave for the client to file a supplemental brief. This promotes effective advocacy because it prevents counsel from allowing frivolous arguments to be made by the client. *See Jones*, 463 U.S. at 751–53.

We also note that the convoluted procedural history in this case illustrates well the hazards of reading Rule 31.3 as Turner's counsel suggest. If represented parties could file pro se briefs, their adversaries would have to respond on two distinct fronts. Apart from the procedural morass that would follow such "hybrid" advocacy (as occurred in this case), our attention would be diverted from potentially meritorious arguments.

In light of the foregoing, we now hold that, except in cases governed by *Anders*, parties represented by counsel may not file pro se briefs. When such briefs are filed nonetheless, the Clerk will refer them to the putative pro se litigant's counsel. At that point, counsel may (1) include the client's pro se arguments in their own briefs or (2) in the appropriate and unusual case, seek leave to file a separate, supplemental brief drafted by counsel that advances arguments raised by the client. Of course, such briefs should make only those arguments

18

counsel believe, consistent with their ethical duty, to be meritorious.

V

For the reasons stated, we will affirm Turner's conviction.