**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-2949

_____

UNITED STATES OF AMERICA

v.

CARLTON REMBERT,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:21-cr-00247-002)
District Judge: Honorable Joel H. Slomsky

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 3, 2025

_____

Before: KRAUSE, PHIPPS, and ROTH, *Circuit Judges*

(Filed: March 24, 2026)

_____

OPINION[*]

_____

PHIPPS, *Circuit Judge*.

A legally blind Virginia man in his late sixties was tried in federal court in
Pennsylvania on seven charges related to defrauding incapacitated persons in the
Philadelphia area. He filed several motions before, during, and after trial, and the District
Court denied many but not all of his requests. Ultimately, a jury convicted him of four

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

counts. In this appeal, he challenges the denial of his motions to transfer venue, to suppress certain bank records, to acquit him of the charges on which the jury returned a guilty verdict, and to hold a new trial. For the reasons below, we will affirm.

BACKGROUND

State courts in Pennsylvania may appoint guardians to manage the finances and medical care for incapacitated persons, referred to as 'wards.' When a family member is unwilling or unable to be a guardian, it is common for courts to appoint organizations to provide those services. One such court-appointed guardianship service provider was RES Consulting, which was owned by Robert Stump and was based in Havertown, Pennsylvania. Around 2007, RES hired Gloria Byars as its office manager, and in that capacity, she had access to the bank accounts for RES's wards, but she was not authorized to open bank accounts for them.

While working at RES, Byars used her knowledge of guardianship services to pursue other ventures. She created a separate medical-billing business, and she started a competitor guardianship business.

People close to Byars also started businesses in the field of medical billing. One of her friends, Alesha Mitchell, who lived in Suffolk, Virginia, created a medical-billing business in 2014. In addition, Byars's brother, Carlton Rembert, who lived in Hampton, Virginia, was in his sixties, had diabetes, and was legally blind due to glaucoma, created two medical-billing businesses. Between 2015 and 2018, Rembert opened five bank accounts across four financial institutions – including PNC Bank and BayPort Credit Union – for his two businesses.

In October 2016, RES discovered that Byars had opened a competing guardianship business, and it fired her. Stump later learned that Byars had opened bank accounts for

2

one of his wards at a bank that he did not typically use. That discovery led Stump to initiate a meeting with the District Attorney's Office for Delaware County, Pennsylvania. The District Attorney's Office opened an investigation into Byars and later partnered with federal law enforcement agencies. They began looking into not only financial transactions overseen by Byars but also transactions involving the businesses owned by Mitchell and Rembert.

Some of the transactions of interest to law enforcement involved accounts at PNC Bank. Initially, the accounts of interest were those belonging to Byars. In June 2019, pursuant to a search warrant issued by the Common Pleas Court in Delaware County, the District Attorney's Office obtained records from her accounts at several banks, including PNC. From the results of that search warrant, investigators noticed transfers into Rembert's business accounts. And in September 2020, a federal grand jury in the Eastern District of Pennsylvania issued a subpoena to PNC for documents from one of Rembert's business accounts. PNC produced the requested records in response to that grand jury subpoena in October 2020.

In June 2021, that federal grand jury returned a seven-count indictment that charged Byars, Mitchell, and Rembert with several counts each for defrauding wards. The first count in the indictment asserted that Byars, Mitchell, and Rembert were part of a single conspiracy to commit bank fraud. *See* 18 U.S.C. § 1349. In March 2022, Mitchell, pursuant to a plea agreement, pleaded guilty to that count, and the other charges against her were dismissed. She later received a one-day prison sentence followed by three years of supervised release and was ordered to pay $85,974.35 in restitution.

After Mitchell's sentencing, a grand jury returned a superseding indictment that charged Byars with ten counts and Rembert with seven counts – again all related to

defrauding wards. As before, the first count was for conspiracy to commit bank fraud, *see* 18 U.S.C. § 1349, but the identified members of the conspiracy were only Byars and Rembert. The second count charged them with bank fraud and aiding and abetting bank fraud, *see id.* §§ 2, 1344, based on the issuance of checks from wards' accounts followed by the deposit of those checks into Rembert's accounts, the issuance of checks from Rembert's accounts to Byars's businesses, and the deposit of checks into Byars's accounts. In addition, the next five counts in the superseding indictment charged Byars and Rembert with wire fraud, *see id.* § 1343, based on the transmission of five electronic images resulting from deposits of checks from the wards' accounts.[1]

Byars and Rembert responded differently to those charges. Byars pleaded guilty to four of them, but before she was sentenced, she died. Rembert pleaded not guilty to the charges against him.

Rembert filed several pre-trial motions. One of those was a motion under Federal Rule of Criminal Procedure 21(b) to transfer venue to the Eastern District of Virginia as a more convenient forum. The District Court denied that motion.[2] Another of his motions was to suppress the use of some of the bank records from PNC. The District Court denied that motion as well.

On November 7, 2023, the day after jury selection, Rembert's trial began. In its case-in-chief, the prosecution introduced evidence that Rembert deposited 46 checks totaling over $695,000 into the five bank accounts that he had opened for his two businesses as the sole authorized user at the time: 42 checks from ward accounts that were accessible

---

[1] The final three counts were against only Byars for one count of money laundering, *see* 18 U.S.C. §§ 2, 1956(a)(1)(B)(i); one count of filing a false income tax return, *see* 26 U.S.C. § 7206(1); and one count of failing to file a tax return, *see id.* § 7203.

[2] Although he was represented by counsel, Rembert also filed a *pro se* motion to dismiss for improper venue, which the District Court considered and rejected.

4

by Byars and four checks from Byars's businesses. Although the notations on the checks indicated they were for services rendered by Rembert's businesses, the wards' relatives testified that Rembert's businesses did not provide any services to the wards.

In addition to its evidence of deposits into Rembert's bank accounts, the prosecution introduced evidence that Rembert withdrew money from those accounts. Bank records admitted as evidence, including those from PNC that were obtained as a result of the grand jury subpoena, indicated that Rembert made 94 cash withdrawals from his accounts – all of which were under the triggering amount of $10,000 for currency transaction reporting requirements. *See* 31 C.F.R. § 1010.330. And there were also two checks from BayPort Credit Union that Rembert mailed from Virginia to Byars's home address in Havertown.

During its case-in-chief, the prosecution also presented Mitchell as a witness. Rembert objected on relevance grounds on the premise that Mitchell and Byars were not members of the same conspiracy as Rembert and Byars. The District Court overruled that objection.[3] Mitchell herself said very little about Rembert: she testified that she had met him only once when they drove back to Virginia together after they attended a party hosted by Byars and that she did not discuss her medical-billing business with him. The focus of Mitchell's testimony was instead on her working arrangement with Byars. She explained that Byars instructed her to give her business a name that indicated that it was involved in medical billing. Mitchell also recounted that she would receive checks from wards' accounts in the mail from Byars's home address and that she would deposit them into her medical-billing business's bank account. Mitchell would then mail a check in an amount specified by Byars to Byars's home address and keep a portion of the money deposited from the wards' accounts for herself.

---

[3] The District Court subsequently gave a limiting instruction, cautioning the jury about the significance of Mitchell's plea agreement relative to her testimony.

5

After the prosecution's case-in-chief, Rembert's counsel orally moved for acquittal on all counts based on the insufficiency of the evidence. *See* Fed. R. Crim. P. 29(a). The District Court granted the motion for two of the wire-fraud charges (Counts Three and Five). The trial concluded, and the jury returned verdicts on the remaining five counts. It found Rembert guilty on four of them: conspiracy to commit bank fraud, 18 U.S.C. § 1349 (Count One); bank fraud, *id.* §§ 2, 1344 (Count Two); and two counts of wire fraud, *id.* § 1343 (Counts Four and Six). It returned a not guilty verdict on one of the wire fraud counts (Count Seven).

With the benefit of a court-granted extension, on January 29, 2024, Rembert filed a written motion for acquittal, which sought in the alternative, a new trial. *See* Fed. R. Crim. P. 29(c), 33. The District Court denied that motion, *United States v. Rembert*, 2024 WL 2864035, at *1–2 (E.D. Pa. June 6, 2024), and later sentenced Rembert to concurrent 66-month prison terms for each count, a total of five years of supervised release, and $534,735.38 in restitution.

Through a notice of appeal, Rembert invoked this Court's appellate jurisdiction. *See* 28 U.S.C. § 1291. He now challenges the District Court's denial of two of his pretrial motions, those to transfer venue and to suppress some PNC Bank records, as well as the District Court's denial of his posttrial motion to acquit or alternatively, for a new trial.

## DISCUSSION

### A. The Denial of Rembert's Rule 21(b) Motion to Transfer Venue

Rembert argues that the District Court abused its discretion in denying his motion to transfer venue to the Eastern District of Virginia.[4] Under the Constitution, criminal trials

---

[4] Interwoven in Rembert's argument is the contention that venue was not proper in the Eastern District of Pennsylvania. Rembert attempted to make this argument in the District Court, but he did so through a *pro se* brief, filed while he was represented by counsel, and an argument raised in such a brief is not preserved for appellate review. *See United States*

6

must be held in the state where the charged offense occurred.  *See* U.S. Const. amend. VI; *see also United States v. Cuevas-Almonte*, 156 F.4th 319, 329 (3d Cir. 2025) (citing U.S. Const. amend. VI; Fed. R. Crim. P. 18).  And among the districts that satisfy that condition, Rule 21(b) of the Federal Rules of Criminal Procedure allows a discretionary transfer for convenience:

> Upon the defendant's motion, the court *may* transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice.

Fed. R. Crim. P. 21(b) (emphasis added).  In *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240 (1964), the Supreme Court adopted ten factors that guide the exercise of discretion in deciding a Rule 21(b) motion.  *Id.* at 243–44.  Those may be expressed as follows:

(1)    the location of the defendant;

(2)    the location of possible witnesses;

(3)    the location of events likely to be in issue;

(4)    the location of documents and records likely to be involved;

(5)    any disruption of defendant's business unless the case is transferred;

(6)    the expense to the parties;

(7)    the location of counsel;

(8)    the relative accessibility of the place of trial;

(9)    the docket condition of each district involved; and

---

*v. Turner*, 677 F.3d 570, 578 (3d Cir. 2012) (explaining that litigants do not have the right to "hybrid representation" by themselves and their counsel (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984))); *cf.* 3d Cir. L.A.R. 31.3 (providing that with the exception of *Anders* briefs, "parties represented by counsel may not file a brief pro se").  And on plain-error review, it is not obvious that venue was improper because offenses that began in one district but are completed in another may be prosecuted "in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a).  *See generally United States v. Dorsey*, 105 F.4th 526, 530 (3d Cir.), *cert. denied*, 145 S. Ct. 457 (2024) (requiring, among other things, a plain or obvious error).

(10)    any other special elements which might affect the transfer.

*See id.*; *see also In re United States*, 273 F.3d 380, 387–88 (3d Cir. 2001) (applying the *Platt* factors to a Rule 21(b) motion).

In response to Rembert's Rule 21(b) motion, the District Court considered the *Platt* factors. It determined that the first (location of the defendant) and the sixth (expense to the parties) favored transferring the case to the Eastern District of Virginia. It gave no weight to two of the factors, the fifth (disruption to defendant's business) and the tenth (other special circumstances). And it concluded that the remaining six factors favored denying the motion. Based on that assessment, the District Court determined that on balance, the *Platt* factors favored denying the motion to transfer.

On appeal, Rembert contests that decision. He argues that the Eastern District of Virginia would have been an appropriate venue because the essential elements of the charged offenses occurred there and that several of the *Platt* factors strongly favor transferring the case there. In particular, he emphasizes that none of his charged conduct took place in the Eastern District of Pennsylvania and that subjecting him to trial there imposed significant burdens on him due to his age, health, and financial means. He further argues that other factors favor trial in the Eastern District of Virginia: he produced documents there, it has a comparatively less busy docket, witnesses were there, and it would be relatively easy for him to find local counsel there.

In opposition, the prosecution points out that the Constitution does not guarantee a criminal defendant a trial in his home district, *see In re United States*, 273 F.3d at 388 (citing *Platt*, 376 U.S. at 245–46), and that the *Platt* analysis should strike a balance "among the most important factors in the particular case," *id.*

Here, the *Platt* factors cut in different directions – some favor transfer; some do not. But the considerations in favor of a transfer for convenience are not so overwhelming that

8

the District Court's denial of Rembert's Rule 21(b) motion was an abuse of discretion. *See United States v. Root*, 585 F.3d 145, 155 (3d Cir. 2009) ("We review a District Court's denial of a motion to change venue for abuse of discretion.").

## B. The Denial of the Motion to Suppress the PNC Bank Records

Rembert argues that the District Court erred in denying his motion to suppress the bank records from his PNC account because there was not probable cause for the June 2019 search warrant. The problem for Rembert is that none of the records produced from that warrant came from Rembert's account – the warrant obtained records from Byars's PNC account; the information from Rembert's account was produced by PNC in response to the 2020 grand jury subpoena. Yet as a matter of law, the Fourth Amendment's protections for unreasonable searches do not apply to grand jury subpoenas for records kept by third parties. *See United States v. Miller*, 425 U.S. 435, 444 (1976) (holding that a grand jury subpoena to a bank for a depositor's records does not implicate any "Fourth Amendment interests of the depositor"). Nor could Rembert have any success with a fruit-of-the-poisonous-tree argument with respect to the grand jury subpoena: even if there were an infirmity with the 2019 warrant for Byars's bank records, it would be of no consequence because "a defendant's Fourth Amendment rights are not violated by the introduction of evidence obtained in violation of a third party's rights." *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) (citing *Rakas v. Illinois*, 439 U.S. 128, 134 (1978)). Thus, on *de novo* review, the District Court did not err in denying Rembert's motion to suppress. *See United States v. Goldstein*, 914 F.3d 200, 203 n.15 (3d Cir. 2019) (reviewing a district court's factual findings on a motion to suppress for clear error and its application of the law *de novo*).

9

### C. The Denial of the Motion for Judgment of Acquittal Based on Sufficiency of the Evidence

Rembert asserts that the District Court erred in denying his motion for acquittal, *see* Fed. R. Crim. P. 29(a), (c), because the evidence at trial was insufficient to find beyond a reasonable doubt that he committed the four crimes for which the jury returned guilty verdicts. On appellate review, the record is viewed "in the light most favorable to the prosecution," *United States v. Kramer*, 75 F.4th 339, 342 (3d Cir. 2023) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)), and a verdict will be upheld "as long as it does not 'fall below the threshold of bare rationality,'" *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013) (en banc) (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012)). The guilty verdicts against Rembert surpass that minimum threshold.

#### 1. Conspiracy to Commit Bank Fraud (Count One)

In attacking his conviction for conspiracy to commit bank fraud, Rembert argues that the evidence against him proved, at most two, separate, independent conspiracies – one between Byars and Rembert and one between Byars and Mitchell – but not a single conspiracy among all three. His argument rests on the premise that he was indicted on a three-person conspiracy between himself, Byars, and Mitchell. That was certainly the charge in Count One of the original indictment. But after Mitchell pleaded guilty to that conspiracy, the grand jury returned a superseding indictment, which, in addition to charging Byars and Rembert with other crimes, identified the conspiracy as one between Byars and Rembert: "[D]efendants GLORIA BYARS and CARLTON REMBERT conspired and agreed together and with other persons known and unknown to the grand jury, to commit bank fraud . . . ." Superseding Indictment ¶ 19 (App. 51–52). Thus, contrary to Rembert's contention, under the charge in the superseding indictment, evidence

that Mitchell also agreed to the conspiracy was not necessary to convict Rembert of conspiracy to commit bank fraud.[5] And without disputing the sufficiency of the evidence that he and Byars entered into a conspiracy to commit bank fraud, Rembert's challenge fails.

### 2. Bank Fraud (Count Two)

Rembert challenges the sufficiency of the evidence for this bank fraud conviction on two grounds. Neither succeeds.

First, he asserts that there was not sufficient evidence of bank fraud because there was not enough evidence that he personally deposited the checks from the wards' accounts into his bank accounts. He is correct that no witness testified that he personally deposited the checks, but the prosecution introduced evidence that over 40 checks from wards' accounts were deposited into Rembert's bank accounts and that Rembert was the sole authorized user for those accounts at the time. Even still, the evidence allows for the possibility that someone other than Rembert deposited over 40 checks from wards' accounts into Rembert's five accounts at four financial institutions. But when viewed in the light most favorable to the prosecution, the evidence allows for a finding beyond a reasonable doubt that it was in fact Rembert who deposited those checks into his accounts. *See Kramer*, 75 F.4th at 342.

Second, Rembert argues that there was not sufficient evidence of a materially false representation or a deceptive course of conduct as required for a bank fraud conviction. But there was evidence that Rembert created two medical-billing businesses with five

---

[5] *Cf. United States v. Whiteford*, 676 F.3d 348, 361 (3d Cir. 2012) ("In the indictment, the government alleged that [the defendants] 'did knowingly conspire . . . with Bloom, Hopfengardner, Stein and other persons known and unknown to the Grand Jury' to commit the conspiratorial schemes listed. When indictments are written in such a manner, so as to include more than one named coconspirator, the identity of the additional co-conspirator(s) is not treated as an element of the offense." (alteration in original)).

different bank accounts at four different financial institutions, from which over $388,000 in money from wards was converted into cash over a 33-month period. And testimony from the wards' relatives revealed that Rembert's medical-billing businesses did not provide any services to the wards. That evidence is sufficient to allow a jury to conclude that Rembert was "knowingly execut[ing] . . . a scheme . . . to obtain any of the moneys . . . owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises . . . ." 18 U.S.C. § 1344(2); *see also Loughrin v. United States*, 573 U.S. 351, 355–56, 358–59 (2014) (holding that a conviction for bank fraud under 18 U.S.C. § 1344(2) requires proving "intent to obtain bank property . . . by means of false or fraudulent pretenses, representations, or promises," but does not require proof of an "inten[t] to defraud a bank" (citation modified)).

3. *Wire Fraud (Counts Four and Six)*

Rembert argues that there was not sufficient evidence to convict him of the wire fraud charges predicated on the transmission of electronic images related to two checks issued from BayPort Credit Union. Specifically, he contends that the prosecution did not call a witness from BayPort Credit Union to testify that Rembert was the person who obtained the checks. But for the charge premised on the image related to the check transmitted on November 3, 2016 (Count Four), the prosecution was able to admit into evidence three items: the check itself that was issued from Rembert's account for which he was the sole authorized user at the time; a document showing that he personally signed for it; and another document showing that the check was sent to Havertown. And for the charge premised on an image related to the check transmitted on August 15, 2017 (Count Six), the prosecution was able to admit into evidence documents showing a withdrawal from Rembert's account in the amount of the check, Rembert's personal signature for the

check, and the check being sent to an address in Havertown. That evidence is enough to allow "any rational trier of fact" to have found Rembert guilty of both counts beyond a reasonable doubt. *Kramer*, 75 F.4th at 342 (quoting *Brodie*, 403 F.3d at 133).

**D. The Denial of Rembert's Posttrial Motion for a New Trial**

Rembert also contends that the District Court erred in denying his motion for a new trial. He argues that the probative value of Mitchell's testimony was substantially outweighed by a danger of unfair prejudice in violation of Federal Rule of Evidence 403 because in her recitation of her interactions and practices with Byars, Mitchell said nothing about financial transactions between Rembert and Byars or herself and Rembert. But Rembert's Rule 403 argument provides minimal explanation of the risk of unfair prejudice, and it does not contend that such prejudice substantially outweighs the evidence's probative value. His thrust is instead on the relevance of the evidence with his assertion that Mitchell's testimony had no probative value because it still left the jury to speculate on Rembert's actions and therefore did not make his actions more or less likely. That is an incorrect assessment. Even though the superseding indictment did not charge Rembert with conspiring with Mitchell, Mitchell's testimony about how she received checks from Byars, deposited them, and issued checks from her account to Byars has some probative value: the jury could infer that Byars had a similar plan for her interactions with Rembert. Thus, as relevant evidence and without Rembert developing arguments that a risk of prejudice substantially outweighed its probative value, the admission of Mitchell's testimony was not an abuse of discretion, *see United States v. El-Battouty*, 38 F.4th 327, 330 (3d Cir. 2022), and the District Court's ruling allowing her testimony cannot be a basis for a new trial.

## CONCLUSION

For the foregoing reasons, the District Court's judgment will be affirmed.