**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-1050

_____

UNITED STATES OF AMERICA

v.

CHANCE D. BONNER,
Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-09-cr-00072-002)
District Judge: Honorable Christopher C. Conner

_____

Submitted under Third Circuit LAR 34.1(a)
April 16, 2012

Before: VANASKIE, ALDISERT and BARRY, Circuit Judges.

(Filed: May 1, 2012)

_____

OPINION OF THE COURT

_____

ALDISERT, Circuit Judge.

This appeal from the judgment of the District Court for the Middle District of

Pennsylvania stems from a string of drug robberies, home invasions and carjackings.

After a jury convicted Appellant Chance Bonner of nine counts arising from these crimes,

the District Court sentenced him to 976 months' imprisonment.

Bonner raises 13 arguments for our disposition on appeal,[1] which fall into four categories: Bonner challenges (1) the District Court's rulings on his motions to suppress inculpatory statements; (2) the sufficiency of the evidence leading to his conviction; (3) the District Court's admission of certain pieces of evidence; and (4) the length of his sentence. Before we address the multitudinous issues raised by Appellant, we note that, in general, "[a]ppellate advocacy is measured by effectiveness, not loquaciousness." Ruggero J. Aldisert, The Appellate Bar: Professional Competence and Professional Responsibility—A View from the Jaundiced Eye of One Appellate Judge, 11 Cap. U. L. Rev. 445, 458 (1982). Effective advocacy in this Court is predicated on a modicum of issues, thus permitting a discussion in depth of the reasons justifying our decision. A party's choice to raise over a dozen issues in one case at best interferes inordinately with the court's calendaring process; and at worst, requires the composition of an opinion on a hodgepodge of helter skelter contentions. More importantly, "[l]egal contentions, like the currency, depreciate through overissue. . . . [E]xperience on the bench convinces [us] that multiplying assignments of error will dilute and weaken a good case and will not save a bad one." Robert H, Jackson, Advocacy Before the Supreme Court, 37 Cornell L.Q. 1, 5 (1951). This case is no exception. For the reasons that follow, we will affirm the District Court's judgment.

---

[1] Bonner's contentions appear both in his opening brief and in a separate, often-duplicative pro se supplemental brief, filed with this Court's permission after Bonner's initial attorney withdrew and before his current attorney began representing him. Since that time, we clarified our Local Appellate Rule 31.3 and held that "except in cases governed by *Anders*, parties represented by counsel may not file pro se briefs." United States v. Turner, No. 10-4573, --- F.3d ---- (3d Cir. 2012). Here, because (1) the panel's grant of permission to file a pro se brief and the government's response to that filing predate Turner, (2) it is unclear whether Bonner was, in fact, represented at the time of his motion, and (3) none of Bonner's pro se arguments ultimately have merit, we see no harm in combining all of the issues for the sake of being complete.

I.

Because we write primarily for the parties, who are familiar with the facts and the proceedings in the District Court, we will revisit them only briefly.

On March 22, 2008, Miqual Hodge[2] bumped into Chance Bonner[3] while walking past Jennifer Bass's house in Carlisle, Pennsylvania. Bonner, who was Bass's boyfriend and the father of her children, invited Hodge to go for a ride in Bass's minivan. During this trip, Hodge sold Bonner a stolen handgun. After some aimless driving and drug use, the group drove to Harrisburg, Pennsylvania, to pick up a friend, Donald Scott.

Scott got into the van carrying a handgun and a ski mask. As they returned to Carlisle, the group discussed who they might rob and settled on a person known as "Mikail." They subsequently parked in front of what they thought to be "Mikail's" home in Carlisle, Pennsylvania. They were mistaken: "Mikail" did not live there; Eric Clarke and his family did. As Clarke walked to his mailbox, Bonner and Scott drew their guns and confronted Clarke. Among other things, the pair demanded drugs from Clarke. App. 00333. When Clarke replied that he had neither money nor drugs, Bonner and Scott told Clarke that they "kn[e]w" he had drugs and searched his jacket to no avail. Id. Growing desperate, Bonner thrust his gun under Clarke's nose and told him to sniff the gunpowder left from an earlier (fictitious) shooting. They ordered Clarke to get money and drugs from his house, threatening to kill Clarke's child if he lied. When Clarke again said that he had nothing, Bonner and Scott told him that they would put him in the trunk of their car until he directed them to a house that *did* have money or drugs. Before they could put

---

[2] Miqual is also referred to as "Michael" in the record.

[3] Chance is also rendered "Chanse" in the record. E.g., App. 00836-00838.

their plan into action, however, a car drove by. Clarke ran to that passing car and called the police. Bonner and Scott retreated to the minivan, where Hodge and Bass waited.

The group then left Clarke's neighborhood and drove to Newville, Pennsylvania. Bonner suggested they visit Quinton Stackfield to collect a $400 debt owed to Bonner's brother for stereo equipment. They parked near Stackfield's apartment, in which he lived with his pregnant fiancée, Renee Barnes, and waited for the couple to return home. When Stackfield and Barnes arrived, Bonner and Scott approached the couple while Bass and Hodge stayed behind. They forced their victims into the apartment, tied Stackfield's arms and legs, and demanded money and drugs. Stackfield insisted he had no money and did not sell drugs, but did occasionally smoke marijuana. Bonner and Scott then took about one gram of marijuana and other items from Stackfield. At gunpoint, the intruders then forced Stackfield to call a friend who had "any amount" of drugs to arrange a meet-up. App. 00375-00376. Stackfield chose Warren Bennett, a friend from school. Bonner and Scott then forced both victims to drive them to Bennett's home nearby.

Scott's pistol greeted Bennett when he opened his apartment door. After bringing Stackfield and Barnes into Bennett's apartment and restraining all three, Bonner and Scott repeated their demands for money or drugs. They beat Bennett with a pistol and threatened to shoot him if he proved uncooperative. Bennett eventually relinquished one and one-half pounds of marijuana and over $3,500 he made from selling marijuana. After unsuccessfully attempting to get Bennett to divulge his marijuana supplier, Bonner and Scott left with Bennett's drugs, cash, mobile telephones, and identification cards in tow.

Two weeks later, on April 8, 2008, a cocaine trafficker named Lori Miller invited Bonner and Scott to join her and another man in robbing Miller's cocaine supplier, Michael Pearson, in Chambersburg, Pennsylvania. The group concocted a scheme in

4

which Bonner and Scott would "break in" to Miller's home after Pearson showed up for what he thought would be the routine payment of a drug debt. The ploy worked. Upon Pearson's arrival, the "robbers" held Pearson and Miller at gunpoint. They pistol whipped Pearson and pretended to assault Miller. Again demanding money and drugs, they took several hundred dollars of Pearson's drug proceeds.

The group then forced their captives—real and pretend—into Pearson's car and made Miller drive. After beating Pearson to comply, he directed the group to his home, where he lived with his wife, Ruth Miller,[4] and their four children. Once there, repeating a mantra to one another that they "got to do this right," the assailants restrained Pearson in his garage. App. 00551. They, likewise, bound Ruth Miller, Lori Miller, and Pearson's cousin. The intruders threatened to kill Pearson's children unless he divulged where his cocaine and money were hidden. When Pearson hesitated, one of Bonner's coconspirators stabbed Pearson in the neck with a screwdriver. Pearson collapsed into a pool of his own blood and faded in and out of consciousness for the next hour. Scott then turned his attention and his pistol to Pearson's wife, forcing Ruth Miller to undress. While his comrades watched, Scott sexually assaulted her.

Afterward, Scott reapplied Ruth's restraints and left her in the garage while the group rummaged through Pearson's home. They absconded with jewelry, televisions, computers, clothes, cellular telephones, identification cards, $1,800 in cash, and either "a couple pieces" or a "fifty-cent piece" of crack cocaine. App. 00517, 00554-00555. After the intruders left, Pearson broke free of his restraints, unbound Ruth Miller, and freed his cousin before again collapsing from his blood loss. Medical technicians later airlifted Pearson to a hospital for treatment, where he recovered from his wounds.

---

[4] Ruth Miller and Lori Miller are not related.

After his arrest and several rounds of police interrogations, discussed in detail below, a grand jury charged Bonner and four codefendants in a 15-Count indictment. Bonner's case was severed from his codefendants' before his trial, at which a jury convicted Bonner of the following:

**Count 1:**    Conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371.

**Count 6:**    Hobbs Act robbery of Clarke, in violation of 18 U.S.C. § 1951.

**Count 7:**    Possession, use or carrying of a firearm during a crime of violence (robbery of Clarke), in violation of 18 U.S.C. § 924(c)(1)(A).

**Count 8:**    Hobbs Act robbery of Stackfield, Barnes and Bennett, in violation of 18 U.S.C. § 1951.

**Count 9:**    Carjacking of Stackfield and Barnes, in violation of 18 U.S.C. § 2119.

**Count 10:**    Possession, use or carrying of a firearm during a crime of violence (robbery and carjacking of Stackfield, Barnes and Bennett), in violation of 18 U.S.C. § 924(c)(1)(A).

**Count 12:**    Hobbs Act robbery of Pearson and Miller, in violation of 18 U.S.C. § 1951.

**Count 13:**    Carjacking of Pearson, in violation of 18 U.S.C. § 2119.

**Count 14:**    Possession, use or carrying of a firearm during a crime of violence (robbery and carjacking of Pearson and Miller), in violation of 18 U.S.C. § 924(c)(1)(A).

After weighing all of the Sentencing Guidelines § 3553 factors, the District Court imposed sentences amounting to 976 months of imprisonment, to be served after the completion of Bonner's state-imposed terms of incarceration.[5] Bonner timely appealed.

## II.

The District Court had jurisdiction because the defendant was charged with offenses against the United States. 18 U.S.C. § 3231. We have jurisdiction over its final judgment pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## III.

We address Bonner's contentions in the following order. First, Bonner challenges the District Court's failure to suppress four sets of statements Bonner made to officers before trial. We disagree and will not disturb the District Court's denials of Bonner's suppression motions. Second, Bonner contends that the government did not introduce sufficient evidence to sustain his convictions on two Hobbs Act robbery charges, two carjacking charges, and his firearms-possession charges. We reject each of these sufficiency challenges. Third, Bonner contests the District Court's decisions to admit potentially prejudicial evidence and expert testimony. We will affirm the District Court's evidentiary ruling. Fourth, Bonner challenges his 976-month sentence on several grounds, none of which persuades us that the District Court erred during sentencing.

## IV.

---

[5] Bonner received concurrent sentences of 240 months (Count Six), 240 months (Count Twelve), 180 months (Count Nine), 180 months (Count Thirteen), and 60 months (Count One); a consecutive sentence of 52 months (Count Eight); a consecutive sentence of 84 months (Count Seven); a consecutive sentence of 300 months (Count Ten); and a consecutive sentence of 300 months (Count Fourteen). See App. 00005.

7

Bonner appeals from the District Court's denials of his motions to suppress four sets of statements. We consider these challenges under a mixed standard of review, accepting the District Court's findings of fact unless clearly erroneous, and reviewing de novo the Court's legal conclusions. See United States v. Brown, 595 F.3d 498, 514 (3d Cir. 2010). We hold that the District Court ruled correctly on each motion to suppress.

It is axiomatic that law enforcement officers must warn a suspect of his right to remain silent and of his right to an attorney before he may be subjected to a custodial interrogation. See Berghuis v. Thompkins, 130 S. Ct. 2250, 2259 (2010) (construing Miranda v. Arizona, 384 U.S. 436 (1966)). A statement made during a custodial interrogation is "inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [his Miranda] rights' when making the statement." Id. at 2260 (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979)). Such a waiver must be (1) "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and (2) "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. (internal quotations and citations omitted). For Miranda's protections to attach, however, a suspect must be *both* in custody, see New York v. Quarles, 467 U.S. 649, 655 (1984), *and* under interrogation (or its functional equivalent), see Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Otherwise, Miranda does not apply, and the Fifth Amendment is not offended by a statement's admission into evidence.[6]

A.

___

[6] We acknowledge that the elicitation of a statement outside of a custodial interrogation may nevertheless run afoul of the Sixth or Fourteenth Amendments. See Massiah v. United States, 377 U.S. 201 (1964); Brown v. Mississippi, 297 U.S. 278 (1936). These doctrines do not concern us in this case.

8

On May 13, 2008, law enforcement officers Miranda-ized Bonner. He then waived his Miranda rights after the police falsely told him that he was not the target of their investigation, and he made some ambiguous statements about his possession of a firearm that the police felt were not "useful" to the investigation. App. 00013 n.12. The District Court found that the officers' use of deception to procure Bonner's waiver, coupled with Bonner's possible intoxication, invalidated his waiver and made his statements inadmissible. See United States v. Velasquez, 885 F.2d 1076, 1088-1089 (3d Cir. 1989).

The next day, the same officers drove Bonner and Bass from Suffolk County, New York, to Harrisburg, Pennsylvania. Bonner's court-appointed attorney asked the officers not to speak with Bonner and cautioned Bonner to remain silent. Once in the police cruiser, though, Bonner initiated a conversation. The officers reminded Bonner that his lawyer had asked them not to speak with him. Bonner chose to speak anyway. The detectives did not Miranda-ize Bonner before or during his remarks.

1.

In denying Bonner's motion to suppress the statements made in the cruiser, the District Court held that Bonner voluntarily spoke and was not interrogated during the ride. See United States v. Benton, 996 F.2d 642, 644 (3d Cir. 1993) (holding that providing an arrestee with information about his charges does not violate Miranda). Bonner contends that the police interrogated him without first Miranda-izing him; and also that any incriminating statements made during his car ride were fruits of his earlier, improper interrogation and should be suppressed as well. The government responds that Bonner was not interrogated, and that the intervening hearing and appointment of counsel attenuated any taint remaining from Bonner's previous unlawfully obtained statements.

2.

9

We will uphold the District Court's denial of Bonner's motion to suppress his May 14, 2008, statements. Bonner was not the subject of interrogation or its functional equivalent, nor were his statements products of his unlawfully elicited, earlier statements.

In Innis, the Supreme Court defined "interrogation" as (a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response. 446 U.S. at 301-302. The Court elucidated this standard in Arizona v. Mauro, 481 U.S. 520, 528 (1987), holding that the police did not interrogate a defendant by allowing him to meet with his wife while recording their conversation. The Court further held that the defendant was not subject to the functional equivalent of interrogation because there was no evidence that the police intended to elicit incriminating statements and there were legitimate reasons, unrelated to securing incriminating statements, for recording the conversation. Id.

Here, nothing suggests that an interrogation or its functional equivalent took place. The police did not subject Bonner to a "lengthy harangue," nor did they make "comments [that] were particularly evocative." Innis 446 U.S. at 303. To the contrary, even though the officers repeatedly admonished Bonner that he was not supposed to speak with them, Bonner volunteered incriminating information without any direct questioning. There is no evidence to suggest, moreover, that the officer purposely transported Bonner and Bass together to elicit incriminating statements. Because Bonner was not subject to interrogation or its functional equivalent, Miranda does not apply.

Bonner's fruit of the poisonous tree contention is controlled by Oregon v. Elstad, 470 U.S. 298 (1985). There, the Court held that suppression is limited to the immediate products of the constitutionally infirm encounter. Subsequent statements, even if direct derivations of the suppressed disclosures, are admissible so long as the original

10

statements were not a product of police coercion. Id. at 310-314. If the prior statement *was* coerced, however, "[t]he question of whether those confessions subsequently given are themselves voluntary depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances." Lyons v. Oklahoma, 322 U.S. 596, 602 (1944). Although "[n]o formula to determine this question by its application to the facts of a given case can be devised," id., the Court has since explained that "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession," Elstad, 470 U.S. at 310.

Here, regardless of whether Bonner's May 13 statements were coerced, his May 14 statements are admissible. If Bonner's past statements were *not* the product of coercion, notwithstanding the police deception, Elstad teaches that we should not suppress his May 14 statements, as they are not tainted by involuntariness. Even if we assume Bonner's May 13 disclosures *were* coerced, the events between the two sets of statements lead us to conclude "that [any] coercion has not carried over into the second confession." Id. Bonner heard proper Miranda warnings on May 13. Over 24 hours passed between his infirm waiver and his subsequent statements. Within this period, Bonner appeared before a judge and had ample opportunity to confer with his court-appointed attorney, who specifically warned Bonner of the consequences of speaking during his car ride. The officers to whom he confessed repeatedly warned Bonner that he should remain silent, and they never engaged in any active interrogation. And given the dearth of details Bonner disclosed on May 13, there was little overlap between the confessions. Bonner's May 14 statements, therefore, were voluntary and untainted by any coercion from his prior conversation with the officers. Admission at trial was appropriate.

11

B.

On May 19, 2008, police interrogated Bonner at the Swatara Township Police Department. The parties now dispute the facts of that interrogation: Bonner claims the police did not explain his Miranda rights nor did they provide an attorney upon his request; the government insists that Bonner heard his Miranda rights and waived them. The District Court credited the government's witnesses' testimony and found that Bonner indeed waived his Fifth and Sixth Amendment rights.

On appeal, we defer to the District Court's conclusions about witness credibility. See United States v. Brothers, 75 F.3d 845, 853 (3d Cir. 1996). Indeed, "when the district court's decision is based on testimony that is coherent and plausible, not internally inconsistent and not contradicted by external evidence, there can almost never be a finding of clear error." United States v. Igbonwa, 120 F.3d 437, 441 (3d Cir. 1997) (citing Anderson v. Bessemer City, 470 U.S. 564, 575 (1985)). Here, aside from Bonner's unsupported assertions, there is no "internally inconsistent" testimony nor contradictory "external evidence" that shows that it was "clear error" to credit the government's story rather than Bonner's. The Court found the detectives' testimony "unequivocal," "consistent," and "credible." App. 00024. And based on this credible version of events, there is no question that Bonner's statements, made after proper Miranda warnings and Bonner's waiver, are admissible.

C.

Bonner repeats this argument for his two subsequent interrogations on May 20, 2008, and again on June 18, 2008, again quarrelling with the government's retelling of the interrogations and claiming that he was never provided Miranda warnings nor the attorney he requested. Here, again, we see no clear error in the District Court's credibility

12

determinations about these two interrogations. Indeed, the case for believing the officers' version of events is made even stronger by Bonner's execution of a signed waiver of his <u>Miranda</u> rights for both sessions. We therefore will not disturb the District Court's judgment about these statements, either.

V.

Bonner next challenges the sufficiency of the evidence supporting his Hobbs Act convictions on Counts Six and Eight, under 18 U.S.C. § 1951, his carjacking convictions on Counts Nine and Thirteen, under 18 U.S.C. § 2119, and each of his firearm convictions, under 18 U.S.C. § 924(c).

We review a motion for a judgment of acquittal for insufficiency of the evidence using a "particularly deferential standard . . . because a reviewing court 'must be ever vigilant not to usurp the role of the jury by weighing credibility and assigning weight to the evidence.'" <u>United States v. Mercado</u>, 610 F.3d 841, 845 (3d Cir. 2010) (quoting <u>United States v. Boria</u>, 592 F.3d 476, 480 (3d Cir. 2010)). We therefore "view the evidence in the light most favorable to the government and must sustain a jury's verdict if 'a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all the elements of the offenses.'" <u>United States v. Rosario</u>, 118 F.3d 160, 163 (3d Cir. 1997) (quoting <u>United States v. Salmon</u>, 944 F.2d 1106, 1113 (3d Cir. 1991)). "[O]nly 'when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt' will we reverse a jury verdict for insufficiency of the evidence." <u>United States v. Walker</u>, 657 F.3d 160, 171 (3d Cir. 2011) (quoting <u>United States v. Mussare</u>, 405 F.3d 161, 166 (3d Cir. 2005)), <u>cert. denied</u>, 132 S. Ct. 1122 (2012).

We address Bonner's various sufficiency contentions in turn.

13

## VI.

Bonner first questions the sufficiency of the government's evidence about his robberies' connections to interstate commerce under the Hobbs Act. Notwithstanding the Hobbs Act's titanic scope, Bonner contends that his convictions for Hobbs Act robberies of Clarke (Count Six) and Stackfield, Barnes and Bennett (Count Eight), stretch the Act beyond its jurisdictional limits. Because "'a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all the evidence of the offenses,'" Rosario, 118 F.3d at 163 (quoting Salmon, 944 F.2d at 1113), we will affirm the District Court's denial of Bonner's motion for acquittal.

To establish a Hobbs Act violation, "the government must show that (1) the defendant committed 'robbery or extortion' or attempted or conspired to do so, and (2) that conduct 'obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce.'" Walker, 657 F.3d at 178-179 (alterations in original) (quoting 18 U.S.C. § 1951(a)). This "obstruct[ion]" need only be "potential," and even a *de minimis* effect will suffice for a conviction. See United States v. Urban, 404 F.3d 754, 762 (3d Cir. 2005) (instructing jury that "[y]ou do not even have to find that there was an actual effect on commerce. All that is necessary to prove this element is that the natural consequences of the [robbery] potentially caused an effect on interstate commerce to any degree, however minimal or slight"); see also United States v. Manzo, 636 F.3d 56, 61 n.4 (3d Cir. 2011) (explaining that even a wholly local scheme brought about through a sting operation would potentially affect interstate commerce).

We have held that "the reach of the Hobbs Act is 'coextensive with that of the Commerce Clause.'" Walker, 657 F.3d at 179 (citing United States v. Parkes, 497 F.3d 220, 230 n.8 (2d Cir. 2007)). Moreover, we have also noted that "a large interstate market

14

exists for illegal drugs [and] Congress has the power to regulate that market just as it has the power to regulate food and drugs in general." United States v. Orozco, 98 F.3d 105, 107 (3d Cir. 1996). Thus, in keeping with Congress's finding that drug trafficking is an illicit business that affects interstate commerce, see 21 U.S.C. § 801, the government may meet its Hobbs Act burden for drug theft cases "by presenting evidence that (1) the [defendants] attempted to rob a [drug] dealer of a *de minimis* amount of drugs and cash, and (2) the drug dealer's [products] originated outside of Pennsylvania." Walker, 657 F.3d at 183-184. In cases involving conspiracy, such as this one, "federal jurisdiction [can] be grounded on proof that the conspiracy, if completed, would affect commerce," United States v. Jannotti, 673 F.2d 578, 591 (3d Cir. 1982) (en banc).

A.

Count Six charges that Bonner, after conspiring with his compatriots to rob drug dealers, attempted to do so by demanding "drugs or money" from a man Bonner thought to be a locally known drug dealer named "Mikail." Bonner contends that his mistaken attempt to rob Eric Clarke instead of his intended target, "Mikail," shows that he did not attempt to rob a drug trafficker, as the government did not introduce evidence about "Mikail," and Clarke was not a drug dealer. The government responds that the evidence is more than sufficient because Bonner: (1) undeniably conspired "to target the business of [drug] trafficking and to use the illicit distribution network of drug traffickers to the robbers' advantage," Brief for United States 42; (2) demanded "money or drugs"; and (3) went on to commit robberies consistent with his conspiratorial aim.

We agree with the government. At trial, the government needed to introduce evidence that Bonner attempted to commit a robbery that had the potential to affect interstate commerce. See United States v. Tykarsky, 446 F.3d 458, 469 (3d Cir. 2006)

15

("[A]n attempt conviction requires evidence that a defendant (1) acted with the requisite intent to violate the statute, and (2) performed an act that, under the circumstances as he believes them to be, constitutes a substantial step in the commission of the crime."). The government has met its burden here by introducing evidence that Bonner conspired to and intended to rob a series of large-scale drug dealers, and that he intended Eric Clarke to be such a target. When Bonner confronted Clarke (thinking he was "Mikail"), he immediately asked for money and drugs, and insisted that he "knew" Clarke had drugs. When Clarke demurred, Bonner and his accomplice demanded that Clarke take them to somebody who did have drugs and money. Indeed, this was the core *modus operandi* of the conspiracy, as Bonner specifically targeted his victims because they were drug dealers. App. 00698-00699, 00704. In each encounter, Bonner and his cohorts demanded drugs as the crux of the robbery and attempted to move up the supply chain to get at more and more drugs.[7] Clarke was simply the unfortunate first victim in Bonner's scheme. That Bonner intended to rob people with large, distribution-sized quantities of drugs is evidenced by the fact that the conspirators became angry or violent if the victim only had a small amount of drugs, and accused the victims of lying or hiding the drugs from them. It is also corroborated by the fact that Bonner believed one of his victims to be the kind of drug dealer that would have $50,000 on hand. App. 00672, 00704.

As for proof that the drugs originated outside of Pennsylvania, the government offered the expert opinion of Chief John Goshert. Chief Goshert testified that, based on

---

[7] For example, the conspirators made one victim, Stackfield, call his drug supplier (Bennett) to set up yet another robbery. When the conspirators got to Bennett, they demanded that he call *his* supplier as well. Likewise, the robbers used Lori Miller to get at her drug supplier: Michael Pearson.

his substantial experience,[8] he had "not seen local grows selling [a] volume of marijuana" consistent with the amount Bonner sought from Clarke and later stole from Bennett. App. 00776-00777. We have explicitly endorsed this as a proper subject for expert testimony. Walker, 657 F.3d at 176 ("[L]aw enforcement officers may, given the proper experience, testify in a Hobbs Act case regarding whether goods had originally been produced in another state."). The expert based his opinion on a reasonable chain of inferences drawn from his experience. And, although the expert candidly admitted the *possibility* that such a large amount of drugs could have been locally grown,[9] and defense counsel did an admirable job of illustrating for the jury through cross-examination why it should reject the expert's opinion,[10] the jury had the benefit of this excellent cross-examination and was not persuaded by the defense theory. See United States v. Gambone, 314 F.3d 163, 170 (3d Cir. 2003) (noting that we "credit all available inferences in favor of the government").

---

[8] He testified that he had nearly 30 years of experience in drug enforcement in central Pennsylvania; he handled about 500 drug cases a month; and had daily interactions with individuals involved in the drug trade ranging from street-level dealers to individuals with connections to other countries. He estimated he had spoken to thousands of drug traffickers. His duties included determining from whom and where drugs were coming.

[9] Chief Goshert testified that, although "marijuana can be grown almost anywhere . . . almost like with tomatoes. . . . [and] they do grow marijuana [in state], . . . . it's hard to grow a huge, huge marijuana crop [in Pennsylvania]." App. 00754-00755. When asked specifically about the amount of marijuana taken from Bennett, Goshert testified that it was "more likely that they were receiving [the marijuana] from out of this area and from those western states that I talked about. . . ." App. 00756-00757.

[10] For instance, the jury heard Chief Goshert admit that he had not examined any of the drugs involved in this case, see App. 00758, 00760-00761, that it was "absolutely" possible for one person to grow 100 pounds of marijuana indoors, in Pennsylvania, in a single harvest, App. 00767, (evidence showed that Bennett regularly trafficked two to three pounds every one to two weeks), and that he was "sure [drug dealers] grow marijuana in Philadelphia [and Pittsburgh]." App. 00777.

In light of this evidence, the jury reasonably could have found that Bonner, in robbing Clarke, attempted to rob a drug dealer under circumstances that would give rise to a potential effect on interstate commerce.

B.

Given our resolution of Bonner's sufficiency challenge for Count Six, Bonner's contentions regarding Count Eight need not long detain us. Bonner contends that the evidence was insufficient to show a potential interstate impact of his attempted and actual robberies of Stackfield, Barnes and Bennett because there is no evidence that the stolen marijuana actually travelled in interstate commerce. In short, we are not persuaded.

The same expert testimony that doomed Bonner's challenge to his conviction for his Clarke robbery is again dispositive here. The government's expert testified that the large amount of marijuana taken from Bennett tends to prove that the marijuana travelled in interstate commerce, testimony that a reasonable jury could have credited. Stackfield and Bennett, moreover, admitted to being drug traffickers,[11] thereby increasing the chance that a robbery of their wares would interfere with interstate commerce. See Parkes, 497 F.3d at 231 (upholding conviction for actual Hobbs Act robbery of 58 small bags of marijuana and $4,000 from a known drug trafficker, without proof that the marijuana originated outside the jurisdiction); see also United States v. McCraney, 612 F.3d 1057, 1065 (8th Cir. 2010) (upholding conviction for an actual robbery of a drug trafficker's cocaine); United States v. Thomas, 159 F.3d 296, 298 (7th Cir. 1998) (same). The government's evidence regarding the several robberies and attempted robberies

---

[11] Indeed, Bennett testified at trial that he was "dealing marijuana" as his main source of income at the time of the robbery, regularly purchasing "two or three pounds" every two weeks over a six month period. App 00410, 00422.

18

encompassed by Count Eight, not to mention Bonner's demonstrated attempts to find even more drugs by demanding the name of Bennett's supplier, was more than sufficient for a reasonable jury to find a potential, *de minimis* effect on interstate commerce.

VII.

Bonner next challenges the sufficiency of the government's evidence underlying his two convictions for carjacking pursuant to 18 U.S.C. § 2119 (Counts Nine and Thirteen). Section 2119 requires proof beyond a reasonable doubt that a defendant: "(1) with intent to cause death or serious bodily harm (2) took a motor vehicle (3) that had been transported, shipped or received in interstate or foreign commerce (4) from the person or presence of another (5) by force and violence or intimidation." United States v. Applewhaite, 195 F.3d 679, 685 (3d Cir. 1999). Bonner quarrels only with the government's proof of his intent to cause death or harm. After reviewing the evidence, it is apparent that the government has met its burden on both Counts.

The intent element of § 2119 is satisfied by showing merely "that the defendant *would have* at least attempted to seriously harm or kill the driver if that action had been necessary to complete the taking of the car." Holloway v. United States, 526 U.S. 1, 12 (1999) (emphasis added). Here, multiple victims testified that Bonner stuck his weapon under their noses and instructed them to smell the gunpowder because he had purportedly just shot someone, and commanded them, at gunpoint, to follow his instructions. Bonner threatened to kill each of his victims during the robberies, and even threatened to kill their children. Moreover, Bonner's compatriots actually *did* assault, rape, and stab victims in the course of their robberies. That these threats and assaults were not contemporaneous with the demands to relinquish a car does nothing to take away from a jury's ability to conclude that Bonner "*would have* at least attempted to seriously harm or

19

kill the driver" if needed. Id. at 12 (emphasis added). The evidence, therefore, was more than sufficient for a "rational trier of fact [to] f[i]nd the essential elements of the crime beyond a reasonable doubt." United States v. Voigt, 89 F.3d 1050, 1080 (3d Cir. 1996).

## VIII.

Bonner's final sufficiency contention, challenging his firearm-possession convictions, lacks merit. Bonner contends that the government did not prove that the gun he was convicted of using was a functioning, operable "firearm" under 18 U.S.C. § 924(c). But a weapon need not be operable to be considered a "firearm" for the purposes of a conviction under § 924. See United States v. Rivera, 415 F.3d 284, 286 (2d Cir. 2005); United States v. Pena-Lora, 225 F.3d 17, 31 (1st Cir. 2000). Courts may look to a variety of nonexclusive factors in determining whether a firearm was possessed, and a gun need not be loaded nor operable to sustain a conviction. See Walker, 657 F.3d at 172 (construing United States v. Sparrow, 371 F.3d 851, 853 (3d Cir. 2004)). Rather, an eyewitness's description of having seen a firearm is sufficient. See United States v. Beverly, 99 F.3d 570, 572 (3d Cir. 1996). Here, Hodge testified that he sold Bonner a functioning firearm, and the government presented testimony from Bonner's victims that the gun appeared to be real. One witness even went so far as to explain that his nine years in the United States Army gave him the experience necessary to identify a real firearm. See United States v. Castillo, 924 F.2d 1227, 1230 (2d Cir. 1991) (holding that there was sufficient evidence that a gun was a "firearm" after witness testimony based on "extensive training and familiarity in the identification and use of firearms"). We therefore conclude that the evidence was sufficient to support the conviction.

## IX.

Bonner next challenges the District Court's decisions about two evidentiary issues, contending that the District Court abused its discretion by admitting (1) a potentially prejudicial photograph, and (2) testimony from the government's drug trafficking expert.

We review the District Court's decision to admit photographs under Rule 403 of the Federal Rules of Evidence for an abuse of discretion. United States v. Jones, 566 F.3d 353, 362 (3d Cir. 2009). "Rule 403 is a balancing test, and '[l]ike any balancing test, . . . is inexact, requiring sensitivity on the part of the trial court to the subtleties of the particular situation, and considerable deference on [our] part . . . to the hands-on judgment of the trial judge.'" United States v. Vosburgh, 602 F.3d 512, 537 (3d Cir. 2010) (quoting United States v. Guerrero, 803 F.2d 783, 785 (3d Cir. 1986)). We therefore will not disturb the District Court's ruling unless it was "arbitrary or irrational." United States v. Kellogg, 510 F.3d 188, 197 (3d Cir. 2007) (quoting United States v. Universal Rehab. Servs. (PA), Inc., 205 F.3d 657, 665 (3d Cir. 2000) (en banc)).

Similarly, "[w]e review the District Court's decision to admit expert testimony for abuse of discretion and exercise plenary review over [the Court's] legal interpretation of Rule 702." Walker, 657 F.3d at 175.

## A.

Bonner first contends that the District Court erred by allowing into evidence a color photograph of Pearson's bloodstained polo shirt. He argues that the image's probative value was substantially outweighed by the danger of unfair prejudice, and thus

should have been excluded under Rule 403 of the Federal Rules of Evidence.[12] We conclude that the District Court acted within its discretion by admitting the photograph.

In the District Court's words, the photograph depicts "a polo shirt with a stain on the upper right quadrant of it which appears to be a blood stain. It also appears that there's some dirt or grime . . . ." App. 00480. The Court found the photograph relevant to corroborate witness testimony and satisfy elements of the Hobbs Act and carjacking charges. Weighing prejudice, the Court held that the photograph was not "in any way inflammatory" because only a shirt—rather than the victim—appears in it. App. 00480.

Bonner contends that the District Court exceeded its discretion by admitting such a prejudicial photograph that had very little probative value. Bonner emphasizes that he never disputed that Pearson had been assaulted, thus depriving the photograph of its probative value and elevating its potentially prejudicial impact. Bonner further contends that the District Court erred in admitting the photograph in color without a jury instruction or a requirement that the photograph be rendered in black-and-white, steps that Bonner believes would have mitigated the prejudicial nature of the photograph.[13]

We agree with the government that a district court's Rule 403 decision to admit potentially prejudicial evidence is the quintessential discretionary trial court ruling with which we are loathe to interfere. Because "the Rule 403 standard is inexact," we owe "considerable deference . . . 'to the hands-on judgment of the trial judge.'" Vosburgh, 602 F.3d at 537 (quoting Guerrero, 803 F.2d at 785). We will reverse such a decision only if the Court's decision to admit evidence was "arbitrary or irrational." Kellogg, 510

---

[12] Rule 403 permits the District Court to exclude relevant evidence if "its probative value is substantially outweighed by a danger of . . . unfair prejudice."

[13] Bonner did not seek such a limiting instruction at trial. App. 00481

22

F.3d at 197 (quoting Universal Rehab., 205 F.3d at 665). Here, the District Court's decision can hardly be characterized as arbitrary or irrational. Even with Bonner's concession that Pearson was assaulted, it is clear that the photograph was introduced to prove more than that fact alone; the government needed to prove Bonner's use of force in the course of his robberies and his conditional intent to cause great bodily harm in the course of his carjackings. We agree with the government, moreover, that the intensive cross-examination of Pearson, which included attacks on Pearson's credibility as a witness, warranted the introduction of corroborating evidence. Accordingly, we conclude that the District Court acted within its permissible discretion in admitting the photograph.

B.

At trial, the government's expert on drug trafficking, Chief Goshert, rendered opinions about the likely geographical origins of several types of drugs, but did not inspect the actual drugs involved in this case. On appeal, Bonner contends that the District Court erred in allowing Chief Goshert to testify speculatively about drugs he did not examine. We conclude that the testimony was properly admitted.

Bonner objected to the introduction of Chief Goshert's testimony under Rules 401, 402, 403, and 702 of the Federal Rules of Evidence. The District Court overruled Bonner's objections that the expert testimony was vague, speculative, and hypothetical, because the testimony "f[e]ll[] within the scope of [Chief Goshert's] expert qualifications." App. 00775. Bonner's contentions on appeal, however, seem to fall entirely under Rule 702, which requires that expert testimony be "based on sufficient facts or data," be "the product of reliable principles and methods," and those principles and methods must be applied reliably to the case. Bonner contends that Chief Goshert's testimony was too speculative and abstract to pass muster under Rule 702.

23

We conclude that Chief Goshert's testimony did nothing to run afoul of the rules governing the introduction of expert opinions at trial. Our recent holding in Walker controls our resolution of this issue. There, we reemphasized that "[a]n expert witness may be permitted to testify regarding scientific, technical, or other specialized knowledge if it will assist the trier of fact to understand the evidence or to determine a fact in issue." Walker, 657 F.3d at 175 (quotations and citations omitted). Under Rule 702, a witness may testify as an expert so long as: (1) the testimony is "based upon sufficient facts or data"; (2) it is "the product of reliable principles and methods"; and (3) "the expert has reliably applied the principles and methods to the facts of the case." "In cases not involving scientific testimony, courts must still serve the gatekeeping function described in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)," Walker, 657 F.3d at 175, but "the factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999). Rather, "the relevant reliability concerns may focus upon personal knowledge or experience." Id.

Here, it is apparent that Chief Goshert's testimony was both relevant and reliable, and was properly admitted.[14] Indeed, in Walker, we rejected contentions almost identical to those made here that the expert—the same Chief Goshert—did not possess the expertise to testify about the geographic origins of drugs and did not use reliable methods for his conclusions. We held that "law enforcement officials can rely upon their

---

[14] We assume without deciding that a particular drug's origin "is sufficiently technical in nature to be the subject of expert testimony under Rule 702." Walker, 657 F.3d at 177 n.14. But see United States v. Needham, 604 F.3d 673, 680 (2d Cir. 2010) ("[A] jury is capable of concluding, based on its lay knowledge, that cocaine is imported into the United States." (citing United States v. Gomez, 580 F.3d 94, 102 (2d Cir. 2009))).

24

specialized knowledge or experience to offer expert testimony on various aspects of drug trafficking." Walker, 657 F.3d at 176 (collecting cases). As was the case in Walker, "Goshert's expert opinions [here] were based upon his personal experiences interacting with drug traffickers and law enforcement personnel over a period of decades. During that time, he had numerous opportunities to investigate the geographic origins of the [drugs] sold in [the area]." Id. Because of this experience, "he did not need to be a professional chemist in order to gather reliable information on whether [drugs] w[ere] being produced inside Pennsylvania or instead being produced elsewhere and transported into Pennsylvania." Id. (citing Betterbox Commc'ns Ltd. v. BB Techs., Inc., 300 F.3d 325, 328-329 (3d Cir. 2002)).

Accordingly, the District Court acted within its discretion in concluding that Chief Goshert's testimony about drugs' origins was reliable and admissible testimony.

## X.

Lastly, Bonner challenges his sentence of 976 months' imprisonment on three fronts. He contends that the District Court (1) misinterpreted the "except" clause in 18 U.S.C. § 924(c) by imposing three consecutive sentences for his three firearms-possession convictions; (2) exceeded its discretion by applying the "life-threatening" sentence enhancement in U.S.S.G. § 2B3.1(b)(3)(C) for Pearson's stabbing; and (3) exceeded its discretion by imposing an unreasonable sentence based on an erroneous interpretation of the facts. For the reasons that follow, we reject each.

Our review of the District Court's legal conclusions is plenary, whereas we review the Court's factual findings and ultimate sentencing decisions for an abuse of discretion. Rita v. United States, 551 U.S. 338, 351 (2007). Complaints regarding sentencing that were not raised below are reviewed for plain error. United States v. Miller, 594 F.3d 172,

25

183 n.6 (3d Cir. 2010). We accord great deference to the Court's choice of a final sentence. United States v. Lessner, 498 F.3d 185, 204 (3d Cir. 2007); see also Gall v. United States, 552 U.S. 38, 51 (2007) ("The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court."); United States v. Tomko, 562 F.3d 558, 565 (3d Cir. 2009) (en banc) ("[D]istrict courts have an institutional advantage over appellate courts in making [sentencing] determinations."). On appeal, Bonner bears the burden of showing that his sentence is unreasonable. United States v. King, 454 F.3d 187, 194 (3d Cir. 2006). We will not reverse a sentence for being substantively unreasonable "unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the District Court provided." Tomko, 562 F.3d at 568.

A.

Bonner contends first that the District Court erroneously interpreted 18 U.S.C. § 924(c) by sentencing Bonner to consecutive sentences of 84, 300 and 300 years' imprisonment for his three § 924(c) convictions. We disagree.

To punish gun possession by persons engaged in crime, Congress made it a separate offense to use, carry, or possess a deadly weapon in connection with "any crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1). The minimum prison term for the first violation of § 924(c) is 60 months, id. § 924(c)(1)(A)(i), to be served consecutively to "any other term of imprisonment imposed on the [offender]," id. § 924 (c)(1)(D)(ii). Each subsequent § 924 conviction, even if occurring in the same case, comes with a consecutively served minimum sentence of 300 months (25 years). See Deal v. United States, 508 U.S. 129, 136-137 (1993).

26

The preface to § 924(c)(1)(A)—the so-called "except" clause—states that courts must impose these minimum terms "[e]xcept to the extent that a greater minimum sentence is otherwise provided by [§ 924(c) itself] or by any other provision of law."

Bonner contends that this clause forbids the imposition of more than one § 924(c) sentence in a case, and requires a court to impose only the single, highest mandatory minimum stemming from all of a defendant's § 924(c) convictions. Applied here, Bonner argues that his conviction for his third § 924(c) offense, which carried a minimum sentence of 300 months, was the "greate[st] minimum sentence . . . otherwise provided by" § 924, and that the "except" clause nullifies his other two § 924(c) sentences.

This argument is foreclosed by United States v. Abbott, 131 S. Ct. 18 (2010), which holds that "a defendant is subject to a mandatory, consecutive sentence for a § 924(c) conviction, and is not spared from that sentence by virtue of receiving a higher mandatory minimum on a different count of conviction." Id. at 23. Bonner is right that Abbott bars "stacking" of § 924(c) sentences, but not of the type that apply here. After Abbott, the "except" clause means that a mandatory seven-year sentence for *brandishing* a firearm would merge into a mandatory ten-year sentence if the defendant *discharged* the gun during the same crime. See id. at 30; United States v. Ham, 628 F.3d 801, 813 (6th Cir. 2011) (citing Abbott, 131 S. Ct. at 26).

In situations such as Bonner's, in which he committed three discrete offenses involving a firearm before being apprehended, it would defy logic to give him a lesser sentence merely because he escaped apprehension and conviction until all three robberies had been committed. See Deal, 508 U.S. at 137. Not only would this likely lead the government to simply hold separate—and wasteful—trials for each firearms offense, but such an interpretation would create precisely the type of "sentencing anomalies" at issue

27

in <u>Abbott</u>. <u>See</u> 131 S. Ct. at 27.[15] Considering Congress's animating, anti-gun rationale for enacting § 924,"[w]e doubt that Congress . . . would simultaneously provide an exception severely limiting application of the [statute]."[16] <u>Abbott</u>, 131 S. Ct. at 29-30. Indeed, Congress could not have "intend[ed] such . . . bizarre result[s]." <u>Id.</u> at 27.

Accordingly, we find no error in the District Court's imposition of consecutive sentences for Bonner's multiple § 924(c) convictions.

B.

Bonner next contends that the District Court exceeded its discretion by enhancing Bonner's sentence for Pearson's "life-threatening" stab wound, pursuant to U.S.S.G. § 2B3.1(b)(3)(C).[17] We reject this contention.

After hearing testimony from Pearson's wife about the blood flowing from Pearson's neck wound, examining the medical records from his injury, and considering

---

[15] For example, consider two defendants, one of whom *possesses* a firearm while trafficking drugs (a 5-year minimum under § 924(c)(1)(A)(i)), and one of whom *discharges* a firearm while trafficking drugs (a 10-year minimum sentence under § 924(c)(1)(A)(iii)). Both later commit a second § 924(c) offense in the course of the crime (a 25-year minimum sentence under § 924(c)(1)(C)(i)). Under Bonner's proposed reading, the more culpable second defendant would receive the same sentence as the less culpable first defendant—25 total years. This would make irrelevant whether such a defendant violated § 924(c) a third—or fourth, or tenth—time before being apprehended; a 25-year sentence would be the maximum possible sentence for all § 924(c) violators.

[16] Other provisions in § 924 and the Sentencing Guidelines reinforce this conclusion. Section 924(c)(1)(D)(ii) declares that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment . . . ." And the Guidelines require "the term of imprisonment [under § 924(c) ] . . . to run consecutively to any other term of imprisonment." <u>Id.</u> § 5G1.2(a); <u>see also</u> <u>id.</u> cmt. 3(B)(iii) (explaining that, if a defendant is convicted of two counts of § 924(c), the "sentence on each count is imposed to run consecutively to the other counts").

[17] Section 2B3.1(b)(3)(C) provides for a six-level enhancement to an offender's base offense level if a victim sustains "[p]ermanent or [l]ife-[t]hreatening [b]odily [i]njury" during the commission of a crime.

the "emergency medical treatment and surgery [needed] to save [Pearson's] life," App. 00854, the District Court concluded that this enhancement should apply. Although it is true that Pearson, in his post-stabbing condition, did manage to snap his restraints, hop up a set of stairs, use a knife to cut his wife and cousin loose, drink juice, and smoke a cigarette, we review the District Court's weighing of the facts underlying this conclusion with the utmost deference. See United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc). Because we cannot say that the District Court clearly erred in finding Pearson's stab wound to be life-threatening, we will not disturb the District Court's application of this enhancement.

C.

Finally, Bonner contends the District Court's 976-month sentence was procedurally unreasonable because it relied on clearly erroneous facts. We do not agree.

When the District Court follows appropriate sentencing procedures, we review for substantive reasonableness, United States v. Cooper, 437 F.3d 324, 330 (3d Cir. 2006), and will affirm "unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." Tomko, 562 F.3d at 568.

Bonner contends that the Court's evaluation of the facts was inappropriate because it based its sentence, in part, on the codefendants' repetition of the "mantra to 'do it right,' . . . meaning with all necessary brutality." App. 00855. Because the phrase "do it right" does not appear in the record, Bonner contends that his sentence rests on a clearly erroneous finding of fact, and is therefore unreasonable.

This contention is baseless, for two reasons. First, the District Court relied on several factors; whether or not the defendants said "do it right" is hardly notable when

29

compared with the robbers' ultimatum to Pearson: "You're going to tell me where it's at or I'm going to kill your kids." App. 00552. Indeed, twelve pages of the record detail the Court's rationale for its sentence. See App. 00865-00877. Second, although Bonner is correct that "do it right" does not appear the record, the phrase "do *this* right" certainly does. See, e.g., App. 00551 ("[W]e got to do this right . . . we got to do this right."). A judge's pronoun substitution hardly rises to the level of procedural unreasonableness.

Accordingly, we find no reversible error evident in Bonner's sentencing.

XI.

For the foregoing reasons, we will reject Bonner's contentions challenging his convictions and sentences, and will affirm the District Court's judgment.